Filed 11/7/23  O'Malley v. Diamond Resorts Management CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PRISCILLA O'MALLEY et al., | |
| Plaintiffs and Respondents, | G061459, G061674, G062420 |
| v. | (Super. Ct. No. 30-2015-00771021) |
| DIAMOND RESORTS MANAGEMENT, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Frederick Paul Horn, Judge.  Affirmed.

Horvitz & Levy, Dean A. Bochner, Emily V. Cuatto; Yoka Smith, Christopher E. Faenza and Martin S. McMahan for Defendant and Appellant.

The Homampour Law Firm, Arash Homampour; Biren Law Group, Matthew B.F. Biren, John A. Roberts; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Respondents.

\* \* \*

Under what is known as the Good Samaritan rule, or the "negligent undertaking" theory of liability, "one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." (*Paz v. State of California* (2000) 22 Cal.4th 550, 558–559 (*Paz*).)

Priscilla O'Malley checked into a hotel room. Her husband Michael repeatedly tried to call her, but she did not answer the phone. Michael called the hotel and said he was afraid Priscilla may have been "'hurt or injured . . . and she's not able to get to the phone.'" The hotel clerk agreed to send a maintenance worker to "go in the room and see if she's okay." But the worker reported the room was dark and no one was there. After several more hours of trying to contact Priscilla by phone, Michael drove to the hotel and went into Priscilla's room. The lights were on, and Priscilla was lying unconscious on the floor. Priscilla had a suffered a ruptured brain aneurism and she now has no ability to lay down new memories (anterograde amnesia).

The O'Malleys sued the operator of the hotel, Diamond Resorts Management, Inc. (Diamond) for loss of consortium and negligence, alleging the delay in getting Priscilla medical aid caused her injuries to worsen. The O'Malleys were awarded about $90 million in damages and prejudgment interest.

Diamond does not contest the amount of the award, but claims: the negligent undertaking theory fails as a matter of law and the trial court improperly instructed the jury on ordinary negligence; the O'Malleys failed to introduce competent evidence of causation; the court erred by allowing a doctor to read a portion of an article to the jury, and by admitting the hotel's written procedures for entering a room; the court erred by refusing to modify a jury instruction on the negligent undertaking theory, and by refusing to instruct the jury that hotel guests have a reasonable expectation of privacy; and the court erred by precluding Diamond from presenting a comparative fault defense.

We find no errors. Thus, we affirm the judgment.

2

# I

## FACTS AND PROCEDURAL BACKGROUND

On Saturday, March 29, 2014, at about 10:00 a.m., Priscilla drove from the O'Malley's home in Riverside to the Diamond Resorts Hotel in Dana Point. The plan was for Michael to join Priscilla and her sister the next day, which was Priscilla's 59th birthday. Priscilla's cell phone was not working, so she took Michael's phone with her.

At about 1:00 p.m., Priscilla arrived in Dana Point for a facial appointment, which had been a gift from Michael. Priscilla called Michael to thank him just before she went in for the appointment.

At about 4:00 p.m., Priscilla checked into the time share hotel, listing Michael and her sister as room guests. Priscilla called Michael to let him know she was in the room. The O'Malleys would ordinarily speak on the phone multiple times a day.

At about 6:00 p.m., Priscilla called Michael and told him she planned to stay in the room the rest of the evening, have a glass of wine, and watch the sunset.

At about 6:30 p.m., Priscilla likely suffered a brain aneurysm and collapsed on the hotel room floor.

At about 7:00 p.m., Michael called Priscilla to check in with her before they both went to sleep. Priscilla did not answer the cell phone, which was unusual.

At about 8:00 p.m., Michael again called Priscilla and she again failed to answer. For the next two and a half hours, Michael repeatedly called the cell phone, as well as the phone in Priscilla's room, and all of the calls went unanswered.

At about 10:30 p.m., Michael called the hotel and spoke to the front desk clerk, K. Mann. When Mann answered the phone, Michael told her, "'I need your help.'" Michael told Mann, "'I'm very worried. I've been trying to reach my wife on the cell phone and the room phone all evening, and she's not answering either one.'" Michael said, "'I'm afraid she could be hurt or injured -- sick or injured, and she's not able to get to the phone.'" Michael asked Mann, "if she can go to the room and go in the room and

3

see if she's okay and to check on her." [1]

Mann first told Michael, "she would call the room; and she called the room." There was no answer. Mann "said she had somebody here at the desk; and she'd send him to the room; and she'd have him go in the room and see if she's okay." Mann told Michael, "'Try not to worry, and we'll call you right back.'"

Mann directed S. Ramos, a maintenance worker who was standing near the front desk "to go check on the room." Mann instructed Ramos: "'Go to the room; check to see if Ms. O'Malley is in the room.'"

Ramos had never done a "welfare check" of a room before. Ramos said he went to room 102, knocked on the door, and loudly said, "'Hello. Maintenance. Hello. Maintenance.'" Ramos said he opened the door using a key card and "called out . . . 'Hello. Maintenance. Hello.'" Ramos said he could not hear anything; "The entire room was mostly dark." Ramos did not enter the room because: "She could have been in the bathroom, getting out of the shower naked. She could have been sleeping. She could have been -- who knows." Ramos said, "I never went in the room." Ramos returned to the front desk and told Mann, "I didn't hear anybody; I didn't see anybody."

Mann called Michael and she told him Ramos had "went to the room; he went in; he checked the room; he went in and everything; and she was not in the room."

Michael was initially relieved Priscilla was not in her room. Michael thought, "maybe she went out to get something to eat and she left the phone behind and I'd hear from her soon." Michael continued to call Priscilla after 10:30 p.m., and "throughout the night."

At about 4:00 a.m., Michael drove from Riverside to Dana Point and arrived at the hotel about 5:15 a.m. Michael knocked on the front door of the lobby. The

---

[1] We view the evidence "in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all inferences in support of the judgment." (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1490.)

4

night clerk let him in and gave him a key to room 102.

Michael said, "as soon as the door cracked, I could see that the light from the bedroom was on."  Michael said the lights from the bathroom were also on and the lights "were illuminating the hallway."  Michael walked down the hall of the room and "heard and then saw her laying on the floor in the middle of the living room."  Priscilla was breathing "in a slow, gasping-sounding breath."  Michael tried to arouse Priscilla, but "she was just unable to respond."

Priscilla was initially taken to a hospital.  Priscilla was then transferred to another hospital, where a CT scan of her brain was performed.  Priscilla was diagnosed with a ruptured brain aneurysm that likely happened the prior evening at about 6:30 p.m.[2]  Priscilla also presented with hydrocephalus, which is a buildup of fluid in the brain.  A neurosurgeon inserted a tube to drain the fluid.

Priscilla now suffers from an inability to lay down any new memories (anterograde amnesia).  Priscilla cannot keep track of what she is doing from moment to moment.  Priscilla "is incapable of independent thought, planning or organization."

*Court Proceedings*

The O'Malleys filed a complaint against Riviera Beach and Spa Resort (Riviera) and Diamond (the operator of the hotel) for loss of consortium and negligence.  The O'Malleys later amended the complaint to add Ramos' employer Hospitality Services Solutions (HSS) as a defendant.

The trial court granted HSS's motion for summary judgment.  This court reversed:  "Under a negligent undertaking theory, we cannot say as a matter of law that the maintenance worker owed no legal duty.  There are triable issues of material fact." (*O'Malley v. Hospitality Services Solutions* (2018) 20 Cal.App.5th 21, 24 (*O'Malley*).)

---

[2] An aneurysm is a weakened area in the wall of an artery.  If the weakened area tears or ruptures, it allows blood to flow out of the resulting opening.

Prior to trial, the parties filed a joint stipulation agreeing to dismiss HSS and Riviera from the lawsuit. Diamond further stipulated it was vicariously "liable for the actions or inactions of . . . Ramos."

Diamond filed a motion in limine to exclude from evidence its employee policy manual on room entry procedures. The written policy stated: "All Team Members must follow the room entry procedures outlined below." (Italics omitted.) The manual directed that two team members were to enter a room in the event of a "reported or believed medical emergency," or in any situation "which would lead a reasonable and prudent person to believe that a person's life or safety may be in danger." The court denied the motion.

Diamond also sought to exclude the testimony of one of the O'Malleys' witnesses, Dr. Tarvez Tucker, on the basis that her expert opinion lacked foundation. During a pretrial hearing, Tucker opined that as a result of the delay in getting Priscilla medical attention, she had a swelling of fluid in her brain (hydrocephalus), causing damage to the primary area of the brain that regulates the storage of new memories (the hippocampus), resulting in Priscilla currently suffering from anterograde amnesia.[3] The court denied Diamond's motion and Tucker testified at trial, along with other experts (the pretrial hearing will be covered in greater detail in the discussion section of this opinion).

Diamond called two medical experts to testify during the weeks-long jury trial. According to Diamond's experts, the rupture of the aneurysm in Priscilla's brain caused blood to tear through the brain's limbic system (the fornix, the hippocampus, and other brain structures that play a role in memory). Diamond's experts opined that the limbic system structures were effectively rendered nonfunctional within minutes of the

---

[3] The term "anterograde amnesia" refers to the temporal relation between the memory loss and the amnesia-causing event (in Priscilla's case, a loss of memories acquired *after* the rupture). The term "retrograde amnesia" refers to the loss of memories acquired *before* the amnesia-causing event. Neither term describes the severity of the condition.

rupture, which resulted in Priscilla's anterograde amnesia and further complications (e.g., Anterior Communicating Artery Syndrome).

The jury found Diamond negligent and awarded the O'Malleys about $60 million in damages. The trial court later awarded the O'Malleys about $30 million in prejudgment interest. The court denied Diamond's motion for a Judgment Notwithstanding the Verdict (JNOV) and motion for a new trial (on many of the same grounds raised in this appeal).

Diamond filed a notice of appeal from the judgment after jury trial, from the order denying JNOV, and from a postjudgment order denying a motion to tax costs. The appeals were later consolidated.

II

DISCUSSION

Diamond claims: A) the negligent undertaking theory fails as a matter of law and the trial court improperly instructed on ordinary negligence; B) the O'Malleys failed to introduce "competent" evidence of causation; C) the trial court erred (1) by allowing a doctor to read a portion of an article to the jury, and (2) by admitting the hotel's written procedures for entering a room in the event of an emergency or a perceived emergency; D) the court erred (1) by refusing to modify a pattern jury instruction on the negligent undertaking theory, and (2) by refusing to instruct the jury that hotel guests have a reasonable expectation of privacy; and E) the court erred by precluding Diamond from presenting a comparative fault defense.

A. *Negligent Undertaking and Ordinary Negligence*

Diamond claims the negligent undertaking theory fails as a matter of law and the trial court improperly instructed the jury on ordinary negligence. We disagree. We find substantial evidence supports the negligent undertaking theory; therefore, we

7

need not address Diamond's alternative ordinary negligence claim.

"The negligent undertaking doctrine incorporates the general rule, and exception, that one who did not create a peril 'is not liable in tort for failing to take affirmative action to protect another unless they have some relationship that gives rise to a duty to act. [Citation.] However, one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking.'" (*Jabo v. YMCA of San Diego County* (2018) 27 Cal.App.5th 853, 878.) "The foundation for considering whether an actor, such as a rescuer, should be exposed to liability on this theory is whether the actor made a specific undertaking '"to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully."'" (*Ibid.*)

"The elements of any negligence cause of action are duty, breach of duty, proximate cause, and damages." (*Peredia v. HR Mobile Services, Inc*. (2018) 25 Cal.App.5th 680, 687; *Paz*, *supra*, 22 Cal.4th at p. 559 [a negligent undertaking theory also requires a showing of duty, breach, proximate cause, and damages].)

Ordinarily, "the existence and scope of a duty are questions of law, while breach, causation, and injury are fact-specific issues for the trier of fact." (*Staats v. Vintner's Golf Club, LLC* (2018) 25 Cal.App.5th 826, 837.) "However, under a negligent undertaking theory of liability, the scope of a defendant's duty presents a jury issue when there is a factual dispute as to the nature of the undertaking." (*O'Malley*, *supra*, 20 Cal.App.5th at p. 27; *Jabo v. YMCA of San Diego County*, *supra*, 27 Cal.App.5th at p. 878 ["factual issues exist about precisely what it was that the defendant undertook to do"].) Within the jury instruction (CACI No. 450C), "each element of the negligent undertaking theory of liability is resolved by the trier of fact." (*O'Malley*, at p. 28.)

"[A] negligent undertaking claim . . . requires evidence that: (1) the actor undertook, gratuitously or for consideration, to render services to another; (2) *the services*

8

*rendered were of a kind the actor should have recognized as necessary for the protection of third persons*; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the actor's failure to exercise reasonable care resulted in physical harm to the third persons; and (5) *either* (a) the actor's carelessness increased the risk of such harm, or (b) the actor undertook to perform a duty that the other owed to the third persons, or (c) the harm was suffered because either the other or the third persons relied on the actor's undertaking." (*Paz*, *supra*, 22 Cal.4th at p. 559, first italics added.)

In this case, the trial court instructed the jury regarding the elements of the negligent undertaking theory as follows: "To establish this claim, Priscilla O'Malley and Michael O'Malley must prove all of the following: [¶] 1. That Diamond Resorts Management, voluntarily rendered services to Michael O'Malley; [¶] *2. That these services were of a kind that Diamond Resorts Management should have recognized as needed for the protection of Priscilla O'Malley*; [¶] 3. That Diamond Resorts Management failed to exercise reasonable care in rendering these services; [¶] 4. That Diamond Resorts Management's failure to exercise reasonable care was a substantial factor in causing harm to Priscilla O'Malley; and [¶] 5. (a) That Diamond Resorts Management's failure to use reasonable care added to the risk of harm; [¶] OR, [¶] (b) That Priscilla O'Malley and Michael O'Malley suffered harm because Michael O'Malley relied on Diamond Resorts Management's services." (Italics added.)

Diamond argues "the second element of plaintiff's negligent undertaking claim fails *as a matter of law* because the risk of harm to Mrs. O'Malley was not reasonably foreseeable to Mann or Ramos." (Italics added.) Diamond attempts to frame the negligent undertaking issue as a *matter of law*, but Diamond is actually arguing there was *insufficient evidence* to support the jury's factual finding on the second element: the reasonable foreseeability of harm to Priscilla. (See *O'Malley*, *supra*, 20 Cal.App.5th at p. 27 ["under a negligent undertaking theory of liability, the scope of a defendant's duty presents a jury issue when there is a factual dispute as to the nature of the undertaking"].)

9

"A challenge in an appellate court to the sufficiency of the evidence is reviewed under the substantial evidence rule." (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968) "'"Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .""'" (*Ibid.*)

Michael testified that when he spoke to the hotel clerk Mann, he told her, "'I need your help.'" Michael said he told Mann, "'I'm *very worried*. I've been trying to reach my wife on the cell phone and the room phone all evening, and she's not answering either one.'" (Italics added.) Michael said, "'I'm afraid *she could be hurt or injured . . .*, and she's not able to get to the phone.'" (Italics added.) Michael testified that he then asked Mann, "if she can go to the room and go in the room *and see if she's okay and to check on her*." (Italics added.)

Michael testified that in response to his request that someone go into the room and check on Priscilla, Mann told him she would send Ramos "to the room; and she'd have him go in the room and *see if she's okay*." (Italics added.) Mann's response to Michael's request indicates that she likely understood the risk of harm to Priscilla (her inability to get to the phone due to her possible incapacitation), and it is a reasonable inference she communicated that risk of harm to Ramos. Moreover, Mann also acknowledged Michael's concern by telling him, "'Try not to worry, and we'll call you right back.'" That is, we think it was reasonable for the jury to infer that at least Mann—and likely Ramos—were aware of the potential gravity of the situation.

In sum, we find there was substantial evidence to support the challenged second element of the negligent undertaking theory. (See *Lenk v. Total-Western, Inc.*,

*supra*, 89 Cal.App.4th at p. 968 [""""We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor""""].)

Diamond alternatively argues it owed no duty to the O'Malleys under an ordinary negligence theory and it "should never have been submitted to the jury." That is, Diamond argues: "The ordinary negligence claim fails because an innkeeper has no duty to enter a guest's private room to investigate why she has not answered her husband's phone calls." (Boldfacing omitted.)

But we have found substantial evidence to support the jury's finding under the negligent undertaking theory, so we need not address this alternative claim of instructional error. (See *Munoz v. Olin* (1979) 24 Cal.3d 629, 631 ["we find substantial evidence to support a negligence theory and accordingly affirm the judgment"].)

Diamond argues: "It is impossible to determine what the jury would have decided on the negligent undertaking claim had the ordinary negligence claim been excluded . . . ." We disagree. The special verdict form separated the ordinary negligence claim from the negligent undertaking claim.

On the ordinary negligence claim, the jury found Diamond was negligent on a 12 to 0 vote and found Diamond's negligence was a substantial factor in causing Priscilla harm on an 11 to 1 vote. As far as the negligent undertaking claim, the jury found the claim was proven by a preponderance of the evidence by at least of vote of 10 to 2 on each element. Thus, we know what the jury separately decided on the negligent undertaking claim. (See *Chance v. Lawry's, Inc.* (1962) 58 Cal.2d 368, 382 ["The jury must be presumed to have understood the instructions on burden of proof and negligence as given them"].)

To reiterate and conclude, we find substantial evidence supports the negligent undertaking theory; therefore, we need not address Diamond's alternative instructional error claim regarding ordinary negligence.

11

*B. The Admission of Expert Testimony on Causation*

Diamond argues the trial court erred by refusing to exclude medical expert testimony as part of its "gatekeeping responsibility." We disagree.

A trial court's ruling on the admissibility of expert testimony is reviewed under the abuse of discretion standard of review. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).) A ruling that constitutes an abuse of discretion has been described as one that is "'so irrational or arbitrary that no reasonable person could agree with it.'" (*Ibid.*)

In this part of the discussion, we shall: 1) review general principles of law; 2) summarize the facts; and 3) analyze the law as applied to the facts.

*1. General Principles of Law*

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, *that is of a type that reasonably may be relied upon* by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801, italics added.)[4]

"The kinds of information most frequently relied on by doctors and mental health professionals in forming their opinions come within the reliable information rule." (1 Witkin, Cal. Evidence (5th ed. 2012) Opinion Evidence, § 34, pp. 652–653.) A testifying medical expert may state his or her opinion based on a diagnosis, or an examination made by another doctor. (*Wicks v. Antelope Valley Healthcare Dist.* (2020)

---

[4] Further undesignated statutory references are to the Evidence Code.

49 Cal.App.5th 866, 876.) A medical expert's testimony may also be based on a study of published material or medical texts. (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 331; but see *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993) 509 U.S. 579, 593 ["Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability"].)

An expert witness "may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based . . . . The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based." (§ 802.)

"The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court *must not* weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court *does not* resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid. '" (*Sargon*, *supra*, 55 Cal.4th at p. 772, italics added.)

"The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion." (*Sargon*, *supra*, 55 Cal.4th at p. 772.) An expert "'must provide a reasonable basis for the particular opinion offered'" and cannot rely "'on speculation or conjecture.'" (*Id*. at p. 770.) However, trial courts must "be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions." (*Id*. at p. 772.) We "assess the trial court's ruling refusing to preclude evidence based on the facts made known to the court when it was asked to make the ruling." (*People v. Ramos* (2013) 216 Cal.App.4th 195, 208.)

## 2. *The Facts Made Known to the Court at the Time of Its Ruling*

Diamond filed a pretrial motion seeking to: "Exclude opinions and testimony of . . . expert witness, Tarvez Tucker, M.D., on the grounds that her opinions lack foundation." Diamond argued: "Dr. Tucker has produced no medical literature which supports her contention that Mrs. O'Malley's short term memory loss was caused by hydrocephalus . . . . Ultimately, when asked during her deposition for medical literature supporting her claim that Mrs. O'Malley's injuries would have been significantly better had she been found at 10:30 p.m. versus 5:00 a.m. the following morning, Dr. Tucker claims that such articles do not exist."

The O'Malleys filed an opposition to the motion. The O'Malleys stated Dr. Tucker "is a board certified neurologist with a sub-specialty certification in neurocritical care. She is a full professor at Oregon Health and Science University, where she is on staff as a neuro-interventionist in the acute care ICU, where she has worked since 2012. [¶] Because her hospital is a referral center for a tri-state area . . . her hospital averages a minimum of 15-16 patients with subarachnoid hemorrhages ('SAH') in the ICU at any given time; and on some days there can be 27-30 SAH patients."[5]

The O'Malleys stated that "based on her extensive special knowledge, skill, and experience," Dr. Tucker is of the opinion "that an SAH patient who is deprived of medical care for more than 7 hours will suffer worse neurologic deficits than had the patient received medical care when first found to have suffered the SAH." The O'Malley's argued: "Of course Dr. Tucker cannot cite to an article exactly on point because it would be inhumane and against all medical ethics to deprive a patient who has suffered a SAH of medical care for the purpose of comparing their condition at the time they were found with what it would be 7 hours later without care."

---

[5] A subarachnoid hemorrhage is bleeding between the brain and the arachnoid membrane that surrounds the brain. The term "subarachnoid" refers to the space in the brain that the blood enters after an aneurysm ruptures.

At the pretrial hearing, Diamond's counsel said that as far as Dr. Tucker's qualifications, "I will stipulate to that. It's just, does she have a foundation such that she could put this evidence before the jury." Tucker testified Priscilla experienced hydrocephalus (buildup of fluid on the brain), which caused permanent damage to the hippocampus that resulted in her having anterograde memory loss. When confronted with Diamond's opposing expert opinions on cross-examination, Dr. Tucker conceded that "the original rupture" and the resulting damage to the limbic system "was a contributor." However, she opined: "The predominant factor for her overriding anterograde memory loss was the bilateral pressure from enlarging ventricles due to untreated hydrocephalus."[6] Tucker said her opinion was based on "a compilation of not only peer-reviewed literature and basic text on neurology, but also my experience in this field for over 30 years."

Diamond's counsel asked, "What article do you have that supports that opinion?" Dr. Tucker testified: "It's not so much articles, this is the basic textbook fact that is taught and learned by medical students from year one. It's due to anatomy. The hippocampus lives underneath the . . . ventricles. Anything that produces pressure, high . . . intracranial pressure . . . within the ventricles, such as blood from a ruptured aneurysm, will produce pressure and compromise on the hippocampus, thereby compromising its function, and resulting in memory loss; specifically anterograde memory loss."

The court ultimately denied Diamond's motion to exclude Dr. Tucker's testimony from the jury trial: "The doctor may testify." Tucker's trial testimony was essentially consistent with her proffered testimony.

---

[6]Generally, ventricles are hollow cavities in an organ. In the brain there are four ventricles, which ordinarily contain cerebral spinal fluid. The brain's two hippocampi are located just below the ventricles.

15

### 3. Analysis and Application

"Any flaws in an expert's opinion may be exposed through the adversary's own evidence or in cross-examination. Those imperfections do not make the expert's sources so unreliable or speculative as to lead to rejection. So long as foundational reliability is met, the strength of an expert's assumptions affects the weight rather than the admissibility of the opinion." (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1121.) "'It is prejudicial error to exclude relevant and material expert evidence where a proper foundation for it has been laid, and the proffered testimony is within the proper scope of expert opinion.'" (*Ibid*.)

Here, Dr. Tucker's opinion about the cause of Priscilla's injuries appeared to be based on her "knowledge, skill, experience, training, and education" in the area of neurology. (See § 802.) Tucker also appeared to have extensive experience in the more specialized area of treating patients with subarachnoid hemorrhages (SAHs). Tucker's testimony about pressure in the brain from an untreated SAH causing further damage to the hippocampus—above the injuries from the rupture itself—also appears to be based on "sound logic." (*Sargon*, *supra*, 55 Cal.4th at p. 772.) That is, even from a lay person's perspective, Tucker's expert opinion about Priscilla's injuries seems to make sense and does not appear to be "based on a leap of logic or conjecture." (*Ibid*.)

Dr. Tucker did not cite any published materials during the pretrial hearing, but that is not a threshold requirement for the admission of expert testimony.[7] (See *Daubert v. Merrell Dow Pharmaceuticals, Inc*., *supra*, 509 U.S. at p. 593 ["Publication . . . is not a *sine qua non* of admissibility"].) The O'Malleys also proffered an ethical explanation for the absence of published studies. And, of course, Diamond had the later opportunity to challenge Tucker's opinions—and the basis of her opinions, as well as the absence of published articles—during her trial testimony. (See *People v. Brock* (1985)

---

[7] Dr. Tucker later cited published materials during her trial testimony.

16

38 Cal.3d 180, 197 ["Cross-examination has been described as 'the "greatest legal engine ever invented for discovery of the truth"'"].)

In short, we do not find that the trial court abused its discretion when it denied Diamond's motion to exclude Dr. Tucker's proffered expert testimony. That is, we do not find the court's evidentiary ruling to be "'so irrational or arbitrary that no reasonable person could agree with it.'" (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

Diamond argues *Lowery v. Kindred Healthcare Operating, Inc*. (2020) 49 Cal.App.5th 119 (*Lowery*), and *Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146 (*Sanchez*), compel a different result. We disagree. In each of those cases, the appellate court found the trial court did not abuse its discretion when it *excluded* proffered expert testimony. But the rulings in *Lowery* and *Sanchez* were based on their particular facts, and we find the instant facts to be distinguishable.

In *Lowery*, a nursing home patient suffered an ischemic stroke and later died. (*Lowery*, *supra*, 49 Cal.App.5th at p. 121.) Plaintiff (patient's daughter) sued defendant (nursing home) alleging its failure to obtain timely treatment caused the patient to suffer brain damage and eventual death. (*Ibid*.) Defendant filed a motion for summary judgment, attaching a declaration of a neurologist who opined that the delay in obtaining medical care "had no bearing on the outcome." (*Id*. at p. 122.) Plaintiff submitted a declaration of a general doctor who opined: "In a conclusory fashion" that treatment of the patient "within three hours of the stroke 'would have provided the opportunity to have the effects of the stroke dramatically reduced.'" (*Ibid*.) Defendant moved to strike plaintiff's proffered declaration on the grounds that it lacked foundation. The trial court sustained the objection and granted the motion for summary judgment finding plaintiff's expert "'has not explained how his training and experience qualifies him to give an opinion on neurological events such as the cause of an ischemic stroke. He cites no reasoning for this opinion.'" (*Id*. at p. 123.) The trial court also found plaintiff's expert did not address a "specific assertion" made in the opposing expert declaration. (*Ibid*.)

17

The Court of Appeal found the trial court did not abuse its discretion because the expert "failed to provide any basis for his opinions." (*Id* at. p. 124.) Further, the doctor's "expertise does not relate to the matters on which he opined." (*Id*. at p. 125.)

In *Sanchez*, plaintiff suffered a subdural hematoma during a high school football game and was later transported to a hospital by defendant ambulance company. (*Sanchez*, *supra*, 8 Cal.App.5th at pp. 149–150.) Plaintiff sued defendant, alleging a delay in transporting him to the hospital increased the severity of his brain injuries. (*Id*. at p. 150.) Responding to defendant's motion for summary judgment alleging lack of causation, plaintiff submitted "the declaration of Dr. Fardad Mobin, a neurological surgeon. Without addressing any of the medical literature presented by defendant, Mobin opined, among other things, that had plaintiff 'been transported immediately . . . there would have been a decrease in brain swelling, and thereby pressure, because the administration of Mannitol would have occurred much sooner.'" (*Id*. at. p. 152.) The trial court sustained objections based on lack of foundation and granted the motion for summary judgment. The Court of Appeal found the trial court did not abuse its discretion because Mobin's declaration was relying on erroneous facts that were not supported by the record, he did not state the basis of his medical opinion, and he did not address the opposing experts' opinions within his declaration. (*Id*. at pp. 162–163.)

Here, unlike the challenged expert opinion in *Lowery*, Diamond conceded Dr. Tucker was qualified in the areas in which she was prepared to proffer an expert opinion. Further, Tucker stated the basis of her opinion was rooted in basic principles of anatomy, as well as her extensive knowledge, training, and experience. Also, unlike the plaintiff's expert in *Sanchez* who relied on erroneous underlying facts to form his opinion, there was no suggestion Tucker was relying on any erroneous facts; Diamond's experts simply interpreted the facts differently and disagreed with Tucker's opinion. Moreover, unlike the plaintiffs' experts in both the *Lowery* and *Sanchez* opinions, Tucker squarely addressed the proffered opinions of Diamond's opposing expert opinions. That

18

is, Tucker agreed that at least some portion of Priscilla's condition was due to the original rupture (as the opposing experts opined); however, Tucker appeared to reasonably opine: "The predominant factor for her overriding anterograde memory loss was the bilateral pressure from enlarging ventricles due to untreated hydrocephalus."

To conclude, we hold that the trial court did not abuse its discretion in exercising its gatekeeping role as far as its evidentiary rulings. That is, the trial court properly refused to insert itself into the jury's exclusive role of "choosing between competing expert opinions." (See *Sargon*, *supra*, 55 Cal.4th at p. 772.)

## C. Two Additional Evidentiary Rulings

Diamond argues the trial court prejudicially erred by admitting evidence over its objection in two additional instances. We disagree.

"Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) The trial court's "discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

In this part of the discussion, we shall analyze: 1) whether the trial court abused its discretion when it allowed one of the O'Malleys' experts to read two sentences from a medical article during a redirect examination; and 2) whether the court abused its discretion when it admitted into evidence Diamond's written procedures for entering hotel rooms in the event of an actual or perceived emergency.

### 1. Expert Testimony on Redirect Examination

"A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is

19

based . . . ." (§ 802.) "Although an expert 'may rely on inadmissible hearsay in forming his or her opinion [citation], and may state on direct examination the matters on which he or she relied, the expert may not testify as to the details of those matters *if they are otherwise inadmissible . . . .*'" (*Korsak v. Atlas Hotels, Inc*. (1992) 2 Cal.App.4th 1516, 1525, italics added.)

"Under the doctrine of 'opening the door,' one party may render otherwise inadmissible evidence admissible by introducing the topic selectively such as to leave a misleading impression. [Citations.] A trial court's ruling on whether rebuttal evidence is admissible on this theory is reviewed for abuse of discretion." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 553.) "The court's decision in this regard will not be disturbed on appeal in the absence of 'palpable abuse.'" (*People v. Hart* (1999) 20 Cal.4th 546, 653.)

Here, the O'Malleys also called as an expert witness at trial Dr. David Frecker, a board-certified neurologist. Frecker testified Priscilla is incapable of "really remembering anything that happens. It's like it goes into her brain and then leaves right away." Frecker opined Priscilla's anterograde amnesia did not result "from any single bleed or even a series of bleeds. [¶] Something else must be going on here, something else must have caused this damage . . . ." Frecker said, "there really is only one possibility anatomically, and that is hydrocephalus." Frecker opined that had Priscilla been discovered in her hotel room at 10:30 p.m. (rather than 5:00 a.m.), and had she received appropriate medical treatment such as a drainage tube, her medical injuries would not have been so severe.[8]

On cross-examination, Diamond's counsel asked Dr. Frecker whether he understood the medical opinions of their two testifying experts that Priscilla's memory issues were caused by the original bleeding (the aneurysm rupture). Frecker said he

---

[8] The trial court repeatedly overruled Diamond's lack of foundation objections to Dr. Frecker's expert testimony. To the extent that Diamond may also be challenging those evidentiary rulings, we find no errors. (See *ante*, Discussion section B.)

understood the opposing expert opinions, and he had read the articles referenced by the two opposing experts, but Frecker said those peer-reviewed articles did not address the type of "profound injury" Priscilla had experienced.

Diamond's counsel asked: "Doctor, do you have one peer-reviewed journal article that supports the position that short-term hydrocephalus causes permanent damage to the short-term memory functions, just one?" Frecker said, "I'm not sure exactly what you're asking. Are there articles that describe an effect of hydrocephalus on the brain and how it affects the memory? There are hundreds of such articles and I would assume that the vast majority of those are peer-reviewed." During the remainder of cross-examination, Diamond repeatedly asked Frecker to produce even one supporting article. At one point during the cross-examination, Frecker testified, "There are many articles that connect hydrocephalus with memory dysfunction. You could take your phone out right now and put those words in, Google them, and you'll come up with many, many articles about that."

After a break, the O'Malleys' counsel asked Dr. Frecker on redirect if he was able to "find any article that relates hydrocephalus to anterograde memory." Frecker said that he had found such an article. Counsel asked Frecker to read a portion of that article; Diamond's counsel objected on grounds of hearsay and lack of foundation. The trial court overruled the objections, and Frecker eventually read the following portion out loud: "Hydrocephalus is known to cause neurocognitive impairment especially of anterograde amnesia in combination with frontal executive function. This is most probably due to the increased intracranial pressure leading to direct pressure on the important structures such as the fornix hypothalamus, mammillary bodies hippocampus corpus callosum and other connecting white matter tracks."

In a motion for new trial, Diamond argued: "The Court erred by allowing Frecker to read the article during redirect." In its written order denying Diamond's new trial motion, the trial court ruled: "This was not hearsay or offered for the truth of the

21

matter asserted in the article – but to show an example of an article that says hydrocephalus can cause anterograde memory loss. [Diamond] opened the door on the subject by repeatedly asking [Dr. Frecker] to show the jury one peer reviewed article that says hydrocephalus can cause anterograde memory loss."

We find the trial court did not abuse its discretion. That is, the court was not arbitrary and/or capricious when it determined Diamond had "opened the door" to the otherwise inadmissible hearsay evidence underlying the expert's opinion (because that is what occurred). Alternatively, we find the court was not arbitrary and/or capricious when it reasonably found the quotation was being offered for the nonhearsay purpose of rehabilitating Dr. Frecker's credibility. (See *People v. Perez* (2017) 18 Cal.App.5th 598, 621 ["trial court did not abuse its discretion by admitting the text messages for the permissible nonhearsay purpose of rehabilitating [a witness's] credibility"].)

In any event, even if we were to find the trial court abused its discretion, we would not find this purported evidentiary error to be prejudicial.

Generally, a judgment shall not be reversed on appeal unless the appellate "court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (§ 353, subd. (b); *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [an appellate court will reverse the judgment only if, after an examination of the entire cause, it is reasonably probable that defendant would have obtained a more favorable result in the absence of the error].) "Although the *Watson* standard is most frequently applied in criminal cases, it applies in civil cases as well." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801.)

Here, the two sentences that were read out loud by Dr. Frecker from the medical article were relatively brief. Further, the brief quotation was merely consistent with the opinion testimony that had already been provided by the O'Malleys' experts on the cause of Priscilla's injuries. Moreover, the jury found Diamond's alleged negligence

22

was a substantial factor in causing harm to Priscilla. In other words, we do not think it is reasonably probable that had the two sentences from the article not been read out loud, the jury would have rendered a different verdict.

### 2. Diamond's Written Safety Procedures

Generally, "all relevant evidence is admissible." (§ 351.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)

It is a long-standing rule that safety procedures are admissible "on the ground that an employee's failure to follow a safety rule promulgated by his employer, regardless of its substance, serves as evidence of negligence." (*Dillenbeck v. City of Los Angeles* (1968) 69 Cal.2d 472, 477–479, 481 [training bulletins that set forth rules on how an officer should operate a vehicle during emergency conditions were admissible]; *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 587–588 [police department manual prescribing officers' use of firearms in wrongful death action was admissible]; *MacColl v. Los Angeles Metropolitan Transit Authority* (1966) 239 Cal.App.2d 302, 308 [rule regarding assisting handicapped, blind and elderly passengers admissible]; *Beal v. Blumenfeld Theatres, Inc.* (1960) 177 Cal.App.2d 192, 194 [rule that theater ushers were to use flashlights to light the way for each patron to their seat was admissible]; *Powell v. Pacific Electric Railway Co.* (1950) 35 Cal.2d 40, 46 [train operation rule regarding reduction of speed in advance of crossing in negligence claim was admissible].)

Here, Diamond's written room-entry procedure mandated that a check of the room by two "team members" was required in any situations "which would lead a reasonable and prudent person to believe a person's life or safety may be in danger." As we discussed earlier in this opinion, the trial court instructed the jury regarding the elements of the negligent undertaking theory using the pattern jury instruction. (See

23

CACI No. 450C.)  As far as the third element of that legal theory, the court modified the instruction as follows:  "*That Diamond Resorts Management failed to exercise reasonable care in rendering these services*[.]"

We find the hotel's written procedure on room entries was relevant to prove the third element of the O'Malleys' negligent undertaking claim (the allegation that the hotel failed to exercise reasonable care).  (See *Dillenbeck v. City of Los Angeles*, *supra*, 69 Cal.2d at pp. 477–479, 481 [safety procedures are admissible "on the ground that an employee's failure to follow a safety rule promulgated by his employer, regardless of its substance, serves as evidence of negligence"].)  That is, Diamond's written procedure had some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (See § 210.)  Thus, we find the trial court did not abuse its discretion by admitting this evidence over Diamond's objection.

Diamond argues on appeal:  "The procedures did not say that the staff was *required* to enter a room in cases of suspected emergency.  Rather, they outlined what the defendant's staff was *authorized* to do when they chose to enter the room for that reason, because the resort recognized the need to respect guest privacy and protect staff members from harm."

Diamond's argument appears to strain the bounds of credulity.  The written policy stated:  "*All Team Members must follow the room entry procedures outlined below*."  In any event, this argument goes to the weight of the evidence (a question for the jury), not its admissibility (a question for the court).

To reiterate and conclude:  1) we find the trial court did not abuse its discretion when it allowed an expert to read two sentences from a medical article during redirect examination because Diamond opened the door; and 2) the court did not abuse its discretion when it admitted Diamond's written room entry procedure into evidence because that evidence was relevant as to the issue of negligence.

24

*D.  Two Additional Jury Instruction Issues*

Diamond argues the trial court committed instructional errors in two additional instances.  We disagree.

"The propriety of jury instructions is a question of law that we review de novo."  (*Hernandez v. Jensen* (2021) 61 Cal.App.5th 1056, 1064.)  "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.'"  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).)

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence."  (*Soule*, *supra*, 8 Cal.4th at p. 572.)  However, courts have also held:  "'Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law.  [Citations.]  Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition.'"  (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217.)

In this part of the discussion, we shall analyze whether the trial court erred: 1) by refusing to modify the pattern jury instruction on the negligent undertaking theory of liability; and 2) by refusing to give the jury a special instruction that hotel guests have a reasonable expectation of privacy.

*1.  Negligent Undertaking Jury Instruction*

As we discussed earlier in this opinion, the trial court instructed the jury regarding the elements of the negligent undertaking theory using the pattern jury instruction.  (See CACI No. 450C.)  As far as the last element of that legal theory, the court modified the instruction as follows:  "That Diamond Resorts Management's failure to use reasonable care added to the risk of harm;  [¶]  OR,  [¶]  (b) *That Priscilla*

25

*O'Malley and Michael O'Malley suffered harm because Michael O'Malley relied on Diamond Resorts Management's services*."  (Italics added.)

At the end of the trial, when discussing jury instructions, Diamond requested the court modify the italicized portion of CACI No. 450C to include the word "reasonably" before the word "relied."  Diamond's counsel argued to the court that the instruction as written "doesn't have reasonable, but I think reasonable reliance is a common phrase for reliance.  In other words, you can't have unreasonable reliance."  The trial court denied the request without explanation.

We agree with the trial court's ruling.  As Diamond concedes, the pattern jury instruction precisely mirrors the elements of the negligent undertaking theory as described in the seminal Supreme Court opinion on the matter.  (See *Paz*, *supra*, 22 Cal.4th at p. 553.)  Further, Diamond's argument in support of modifying the instruction—"you can't have unreasonable reliance"—was not at all clear.  One is left to wonder why the word "reliance" needs to be preceded by the word "reasonable" if there is no such concept as "unreasonable reliance."

### 2. Reasonable Expectation of Privacy Instruction

Diamond filed a written request that the trial court instruct the jury with the following special jury instruction:  "Guests at a timeshare resort have a right to privacy in their rooms.  While resort guests may impliedly consent to resort employees' entering their rooms at reasonable times to perform janitorial, maid, or repair services, guests otherwise have a reasonable expectation of privacy in their rooms."

Diamond largely cited cases involving warrantless, nonconsensual entries by the police, which are generally prohibited under the Fourth Amendment.  (See, e.g., *People v. Escudero* (1979) 23 Cal.3d 800, 807–808 [governmental search of defendant's hotel room without consent of defendant and without a search warrant was unlawful]; *Stoner v. California* (1964) 376 U.S. 483, 489 [same].)

26

Diamond's counsel argued, "Ramos talked about an expectation of privacy is a major issue in the case, and we want to make sure that it's clear and presented to the jury as such." The O'Malleys' counsel argued, "There's no legal defense of privacy in this case. They don't cite any authority that has a legal defense of privacy. It's not a legal defense that should be in the jury instruction." The court ruled, "It's not an issue the court sees either. This talks about guests right to privacy, what guests expectations are and the like. I don't see that as an issue in this case."

We agree with the trial court. The Fourth Amendment was not at issue in this case. Michael was a registered guest in the room, and he agreed to the entry by the hotel staff to check and see if his wife was in the room. Diamond argues: "From a privacy perspective, a guest's own request for an interruption is very different than an off-site caller's request to interrupt the guest." But Diamond's self-serving argument actually supports an analysis that its proposed special jury instruction was "'calculated to amount to an argument to the jury in the guise of a statement of law.'" (See *Major v. Western Home Ins. Co.*, *supra*, 169 Cal.App.4th at p. 1217.)

To conclude, we find: 1) the trial court did not err by refusing to modify the negligent undertaking instruction because it accurately stated the law; and 2) the court did not err by refusing to give the jury an instruction that hotel guests have a reasonable expectation of privacy because the instruction was irrelevant and argumentive.

## E. Comparative Fault

Diamond claims: "The court should reverse for a new trial to allow the jury to allocate fault against Mr. O'Malley. If the jury could find defendant breached a duty to protect Mrs. O'Malley, the jury should have been allowed to consider whether Mr. O'Malley breached that same duty." We disagree. In short, an argument that "what's good for the goose is good for the gander" is not a viable legal theory.

"'California's system of "comparative fault" seeks to distribute tort

27

damages proportionately among all who caused the harm.'" (*Wilson v. Ritto* (2003) 105 Cal.App.4th 361, 367.) "In determining a defendant's share of fault, the court may consider other joint tortfeasors' degree of fault for the plaintiff's injuries . . . . But unless there is substantial evidence that an individual is at fault, there can be no apportionment of damages to that individual." (*Ibid.*)

Absent a legal duty, there is no liability for an alleged negligent tortfeasor. (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 396; *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [threshold element is existence of duty to use due care toward another].) Alternatively, courts have imposed a duty to act where there is some "'special relationship'" between the parties. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235.) For instance, hotels "'have a special relationship with their guests that gives rise to a duty "'to protect them against unreasonable risks of physical harm.'"'" (*Lawrence v. La Jolla Beach and Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 22.)

Here, the O'Malleys filed a pretrial motion seeking to preclude Diamond's comparative fault defense. The O'Malleys argued there was no case law supporting Michael's legal duty based on a "'special relationship'" between a husband and a wife under an ordinary negligence theory. They also argued there was no evidence supporting a claim that Michael had a legal duty under a negligent undertaking theory.

At the hearing on the motion, O'Malleys' counsel argued Michael "didn't undertake to do anything. He was relying on the hotel to do what they promised, which is to see if she was in the room after he told them he's concerned. They said they went into the room, told them she wasn't there, and he thought, okay. There's nothing -- she's not injured or whatever. [¶] That doesn't allow them to then blame him and say he did a negligent undertaking."

Diamond's counsel argued Michael "picked up the phone and called. He had a concern about his wife. And let's say they were at the timeshare together and she keels over from the aneurysm, he doesn't have an obligation to do anything. He can just

28

watch her lay on the floor, but he opted to pick up the phone, make a call, reportedly because he was worried about her health."  Counsel continued:  "Once he makes that decision to take an affirmative step to look out for her, to put the wheels in motion, if you will, that is a duty."

The trial court "tentatively granted" the O'Malleys' motion to preclude Diamond's comparative fault defense; however, the court said that it would revisit its ruling "should it be necessary during the course of the trial."  At the end of the testimony in the trial, the court refused to overrule its prior ruling, or to give any of Diamond's requested jury instructions on comparative fault.

We agree with the ruling of the trial court.

We find that under an ordinary negligence theory, Michael had no "'special relationship'" giving rise to an affirmative duty.  Diamond cites no California legal authorities to support that proposition of law.  (Compare, e.g., *Touchette v. Ganal* (Hawaii 1996) 922 P.2d 347, 352–355 [marriage relationship alone did not constitute "'special relationship'" within meaning of Restatement Second of Torts].)  Indeed, Diamond's trial counsel appeared to acknowledge that Michael did not "have an obligation to do anything."  Although Diamond urges us to invent such a legal duty, we decline to do so.

As far as the negligent undertaking theory, we find no substantial evidence to support the giving of such an instruction (as to Michael).  Once again, "a negligent undertaking claim . . . requires evidence that:  (1) the actor undertook, gratuitously or for consideration, *to render services to another*; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the actor's failure to exercise reasonable care resulted in physical harm to the third persons; and (5) *either* (a) the actor's carelessness increased the risk of such harm, or (b) the actor undertook to perform a duty that the other owed to the third persons, or (c) the harm was

29

suffered because either the other or the third persons relied on the actor's undertaking." (*Paz*, *supra*, 22 Cal.4th at p. 559, first italics added.)

We find Michael did not undertake to *render services* to Priscilla simply by calling the hotel. More importantly, we find it is not reasonably probable that had the jury been instructed on comparative negligence, the jurors would have then found Michael partially at fault for his wife's brain injuries. Indeed, it seems inconceivable to us that a jury would somehow find Michael at fault because he was relying on Diamond's regrettably false information that Priscilla was not in her hotel room. (See *Soule*, *supra*, 8 Cal.4th at p. 580 ["Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict'"].)

III

DISPOSITION

The judgment is affirmed. The costs on appeal are awarded to plaintiffs Priscilla and Michael O'Malley.

MOORE, ACTING P. J.

WE CONCUR:

MOTOIKE, J.

DELANEY, J.

30